IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JAIME GOLDTOOTH, as Guardian and Conservator for the Estate of Cody Goldtooth, and ZURICH AMERICAN INSURANCE COMPANY, | **8:20CV113** |
| Plaintiffs, | |
| v. | **MEMORANDUM AND ORDER** |
| THE WESTERN SUGAR COOPERATIVE, | |
| Defendant and Third-Party Plaintiff, | |
| v. | |
| DSI MECHANICAL, LLC, | |
| Third-Party Defendant. | |

This matter is before the Court on the parties' various motions (Filing Nos. 175, 183, 186, 189, 192, 196) to exclude, in whole and in part, the testimony of each other's experts. As described below, the Court finds most of their concerns do not warrant wholesale exclusion at this time.

## I.  BACKGROUND

Defendant and third-party plaintiff The Western Sugar Cooperative ("Western Sugar") is a sugar-processing company based in Denver, Colorado. Western Sugar owns and operates a sugar-beet-processing facility in Scottsbluff, Nebraska. In 2015, Western Sugar began work on a large expansion project at the Scottsbluff facility (the "plant").

Western Sugar hired Paul Reed Construction ("Paul Reed") to complete demolition in the plant's main building. In the process, it permitted Paul Reed employees

to cut a large hole in the floor of the second level of the plant building to remove debris. The hole was eventually covered with a piece of plywood.

Western Sugar also hired third-party defendant DSI Mechanical, LLC ("DSI"), a now-defunct South Dakota company, to work on the project. At the time, DSI employed 28 year-old Cody Goldtooth ("Cody") as an ironworker.

Cody and other DSI employees began working at the plant in Summer 2016. On August 3, 2016, Cody went to retrieve plywood to place over machinery to protect it from welding sparks while he and his colleagues were installing some equipment. In doing so, Cody ventured to the second level of the plant building and found the plywood placed over the hole created by Paul Reed. Upon lifting the plywood, Cody fell through the hole.

Cody suffered a number of serious injuries, most notably a traumatic brain injury. The nature, extent, and causes of those injuries are the subjects of this lawsuit. On March 25, 2020, Cody sued Western Sugar (Filing No. 1), claiming the company was liable for his injuries based on its alleged negligence, failure to maintain the safety of its facility, and failure to warn about the hole.[1]

Western Sugar answered Cody's complaint and filed a third-party complaint (Filing No. 32) against DSI. In its third-party complaint, Western Sugar blames the accident on "[Cody]'s own negligence" and DSI's failure to supervise and train Cody. As a result, it asserts DSI is responsible for Cody's claims under the indemnification clause in the contract between Western Sugar and DSI.

---

[1]Cody originally named DSI and Zurich American Insurance Company ("Zurich") as "Third-Party Defendants" in his complaint. He alleged that, through Zurich, DSI had paid over $1.6 million in workers' compensation benefits in relation to the incident, and that the companies therefore had a subrogation interest in his requested recovery. On the parties' stipulation (Filing No. 55), the magistrate judge later realigned Zurich as a plaintiff in the action (Filing No. 56).

The parties have been engaged in discovery for the past few years. Pursuant to the Amended Trial Setting Order (Filing No. 105), Cody submitted his expert disclosures on June 30, 2023. On January 24, 2024, Western Sugar likewise made timely expert disclosures (Filing No. 128). Cody submitted rebuttal expert reports on June 25, 2024. A jury trial is currently scheduled to begin on January 13, 2025.

On July 26, 2024, Cody moved (Filing No. 149) to be substituted as a plaintiff by Jaime Goldtooth ("Goldtooth"), who was appointed as his guardian and conservator as a result of his incapacitation from the traumatic brain injury. *See* Fed. R. Civ. P. 25(b). The magistrate judge granted that unopposed motion soon after (Filing No. 152).

The parties have since filed a number of motions, including the present ones to exclude expert testimony and others for sanctions (Filing No. 151) and summary judgment (Filing Nos. 157, 179, 195). *See* Fed. R. Civ. P. 37, 56. Their evidentiary requests are varied. For Goldtooth's part, she asks the Court to exclude (Filing No. 196): (1) the testimony of Paul J. Bennett, M.S., CBIE ("Bennett"); (2) any testimony of Terry A. Davis, M.D., J.D., L.F.A.P.A. ("Dr. Davis") "speculating about what 'we don't know'" about Cody's personal and medical history; (3) the opinions of Dr. Davis and Alexander Merkler, M.D., M.S. ("Dr. Merkler") that Cody suffered from alcohol use disorder before the accident; and (4) the opinions of Dr. Davis, Dr. Merkler, and Deborah Hoffnung, Ph.D., ABPP-CN ("Dr. Hoffnung") regarding pre-existing conditions that could be causing or contributing to Cody's current condition.[2]

DSI and Zurich also challenge Western Sugar's experts (Filing Nos. 175, 192). Both seek the exclusion of Bennett's testimony, though for different reasons. Zurich further asks the Court to exclude the testimony of David DiTommaso, M.S. ("DiTommaso"), and any opinion by Dr. Davis as to Cody's blood alcohol content ("BAC") on a prior occasion or possible pre-existing seizure or alcohol use disorder.

---

[2]Goldtooth has clarified that she has abandoned the other requests in her motion not mentioned here (Filing No. 220).

3

Western Sugar takes equal issue with Goldtooth's experts. It argues the Court should completely exclude the testimony of Terry Stentz, Ph.D., M.P.H., CPC, CPE ("Stentz") (Filing No. 183). Western Sugar also asserts the Court should preclude any testimony from Alissa Wicklund, Ph.D., ABPP ("Dr. Wicklund") and Chad Prusmack, M.D., FAANS ("Dr. Prusmack") that Cody's traumatic brain injury will cause progressive impairment or other neurological diseases, including dementia (Filing No. 189). Finally, it moves for the exclusion of all of Goldtooth's rebuttal expert opinions (Filing No. 186), including those from Doug Fletcher, CSP, CHI, M.S. ("Fletcher"), Dr. Wicklund, Dr. Prusmack, Stentz, Bruce Fischer, M.Arch., R.A., LEED AP ("Fischer"), Jan Roughan, B.S.N., R.N., Ph.N., CCRN/ABSNC, CNLCP, CCM ("Roughan"), and Ted Stricklett, M.S. ("Stricklett"). Each motion is now fully briefed and ripe for the Court's review.

## II.    DISCUSSION

### A.    Standard of Review

The admissibility of expert testimony in a diversity case is governed by the Federal Rules of Evidence. *See S&H Farm Supply, Inc. v. Bad Boy, Inc.*, 25 F.4th 541, 551 (8th Cir. 2022). Federal Rule of Evidence 702 provides that a witness "qualified as an expert by knowledge, skill, experience, training, or education" may give opinion testimony if the party offering their testimony demonstrates their "specialized knowledge will help the trier of fact" and their opinions are "based on sufficient facts or data," are "the product of reliable principles and methods," and "reflect[] a reliable application of the principles and methods to the facts of the case." *See also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) (explaining the district court should also be mindful of Federal Rules of Evidence 403, 703, and 706 when assessing proffered expert testimony). The Eighth Circuit frames the question of admissibility of expert testimony as a "three-part test" requiring that (1) expert testimony be "useful to the finder of fact in deciding the ultimate issue of fact," (2) the witness be "qualified to assist the finder of fact," and (3) the proposed testimony be "reliable or trustworthy in an evidentiary sense."

*Academy Bank, N.A. v. AmGuard Ins. Co.*, 116 F.4th 768, 790 (8th Cir. 2024) (quoting *Johnson v. Mead Johnson & Co.,* 754 F.3d 557, 561 (8th Cir. 2014)).

In *Daubert*, "the Supreme Court set forth a number of factors that district courts may consider in assessing reliability." *Wagner v. Hesston Corp.*, 450 F.3d 756, 758 (8th Cir. 2006). Those factors include "(1) whether the theory 'can be (and has been) tested,' (2) whether the theory 'has been subject to peer review and publication,' (3) 'the known or potential rate of error,' and (4) whether the theory enjoys general acceptance in the relevant [] community." *Id.* (quoting *Daubert*, 509 U.S. at 593-94). This inquiry is flexible though, giving district courts "considerable leeway" in assessing the reliability of expert testimony in the context of each case. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 150 (1999) (stating the *Daubert* factors are not a "definitive checklist" and the inquiry depends on the circumstances of each case (quoting *Daubert*, 509 U.S. at 593)); *see also United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006) (explaining the "*Daubert* factors are not intended to be exhaustive or unduly restrictive" when expert testimony is based on specialized, not scientific, knowledge).

"The proponent of the expert testimony bears the burden to prove its admissibility." *Menz v. New Holland N. Am., Inc.*, 507 F.3d 1107, 1114 (8th Cir. 2007) (quoting *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001)). Overall, the Court has "broad latitude" in fulfilling its important "'gatekeeping' obligation" with regard to expert testimony. *Kumho Tire*, 526 U.S. at 141. Because the admission of expert testimony is meant to be liberal, the Court resolves doubts in favor of admissibility. *See Daubert*, 509 U.S. at 588; *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1001 (8th Cir. 2019) (stating "cases are legion that under *Daubert*, liberal admission is prevalent"). Thus, "[a]s long as the expert's scientific testimony rests upon 'good grounds, based on what is known' it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset." *Johnson*, 754 F.3d at 562 (quoting *Daubert*, 509 U.S. at 590).

### B.    Western Sugar's Expert Testimony

#### 1.    Bennett's Testimony

Goldtooth, Zurich, and DSI assert Bennett's testimony should be excluded for various reasons.  Bennett is a licensed professional engineer and general contractor with degrees in mechanical and civil engineering.  According to his report (Filing No. 177-14), Bennett has "spent thousands of hours on construction jobsites," during which he has worked around fall hazards and supervised subcontractors.  As part of his current role as Principal at Exponent, Inc.—an engineering-consulting company—Bennett is "often responsible for jobsite safety."  He reports he has completed and passed the Occupational Safety and Health Administration ("OSHA") 30-hour construction safety course and has been "retained by OSHA to investigate construction jobsite injuries."

Western Sugar retained Bennett to "determine if DSI violated [OSHA] standards" in relation to Cody's accident and to respond to some of Goldtooth's expert reports.  Bennett's analysis concludes that—during its work at Western Sugar's facility—"DSI had a contractual obligation to comply" with a number of cited OSHA regulations, "had primary responsibility" for Cody's safety under OSHA's Multi-Employer Worksite policy, and "apparently failed to train" Cody or communicate with him regarding the site's hazards and proper safety measures.

According to Goldtooth, Zurich, and DSI, Bennett's testimony suffers from a number of flaws.  DSI asserts Bennett is not qualified to give opinions as to jobsite safety "because he has had minimal safety training and has never worked as a safety professional."  It also argues his opinions are "unreliable, irrelevant, and prejudicial," specifically challenging his opinion that DSI failed to properly train Cody as speculative.

Zurich, on the other hand, claims Bennett's testimony should be excluded because it "is purely legal in nature," unreliable, and irrelevant.  Relying on the principle that "expert testimony on legal matters is [generally] not admissible," Zurich asserts Bennett should not be permitted to opine regarding the applicable OSHA regulations and whether

6

DSI complied with them.  *S. Pine Helicopters, Inc. v. Phx. Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003).

Goldtooth has other issues with Bennett's testimony.  She argues the entirety of Bennett's testimony is unreliable because Western Sugar instructed him not to consider its conduct at all.  Nor did he review the records of Mark Suhr ("Suhr"), who the parties now acknowledge essentially acted as the on-site project manager.  Those records, the delayed disclosure of which is the subject of DSI's pending motion for sanctions, consist of 1,470 pages of daily reports and hundreds of photographs from the jobsite.

Western Sugar defends Bennett's qualifications, stating his industry experience as a "licensed general contractor and engineer" provides relevant specialized knowledge to opine about applicable industry standards, like those set forth by OSHA regulations.  It asserts DSI's argument would instill a nonexistent "hyper-specific specialization" requirement.  With regard to Zurich's arguments, Western Sugar attempts to frame Bennett's opinions as conclusions on "industry standards" as opposed to impermissible legal conclusions.  It also retorts that the omission of Suhr's records is irrelevant here because there is no rule that an expert base their testimony on "*every* fact or piece of data" and the remaining criticisms do not warrant exclusion under the liberal admissibility standards.

To start, the Court is satisfied that Bennett is generally qualified to render opinions as to construction jobsite safety.  It is the Court's role to determine whether a proffered expert has "sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case.'"  *Kumho Tire*, 526 U.S. at 156 (quoting 4 J. McLaughlin, Weinstein's Federal Evidence ¶ 702.05[1], p. 702-33 (2d ed. 1998)); *see also Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001).  An expert may be qualified based on their "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702; *see also Fox v. Dannengberg*, 906 F.2d 1253, 1256 (8th

Cir. 1990) (explaining those sources of specialized knowledge are not ranked by the federal rules).

The Court further finds Bennett's experience bears a sufficiently "close relationship" to the subject of his opinion. *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009); *Hirchak v. W.W. Grainger, Inc.*, 980 F.3d 605, 609 (8th Cir. 2020) (stating the court "must not permit an expert to proceed 'beyond [their] expertise'" (quoting *Am. Auto. Ins. v. Omega Flex, Inc.*, 783 F.3d 720, 725 (8th Cir. 2015))). Though DSI complains that Bennett has never held a formal position as a safety official, Bennett's training and experience nonetheless render him qualified to testify about jobsite safety in this case. As described above, Bennett has a breadth of professional experience on construction jobsites and in managing the safety of those jobsites. He has also completed pertinent OSHA training and worked with OSHA on investigations. In total, these experiences have given him enough specialized knowledge to render testimony on such issues in a manner that could be helpful to jurors at trial.[3] The potential weaknesses DSI points to, along with any other challenges to Bennett's "skill or knowledge," are for a jury to consider in weighing his testimony. *See Fox*, 906 F.2d at 1256.

That doesn't mean all of Bennett's conclusions will be admissible. The Court agrees to some degree with DSI and Zurich's arguments that Bennett's report includes some questionable opinions. For example, it is relatively clear that Bennett's testimony about the terms of the contract between Western Sugar and DSI is inadmissible in these

---

[3]Cases to the contrary involving a total lack of related experience, including those cited by DSI, are clearly distinguishable from the present circumstances. *See, e.g.*, *Schmidt*, 557 F.3d at 571 (upholding the district court's exclusion of an expert where he planned to opine on, among other things, strip-search procedures but there was "no evidence [he] had any experience with" strip searches in his roles as a traffic patrolman and security officer); *Wheeling Pittsburgh Steel Corp.*, 254 F.3d at 715 (concluding the district court erred in permitting an expert to opine about safe warehousing practices where the expert, a hydrologist educated in flood-risk management, had no experience relevant to the subject).

circumstances. *See Weitz Co., LLC v. Lexington Ins. Co.*, 786 F.3d 641, 647 (8th Cir. 2015) (explaining an expert's interpretations of an insurance policy and construction contract were clear invasions "of the interpretive responsibilities and legal pronouncements of the trial judge"). The Court also agrees with DSI that Bennett's opinion that DSI failed to train Cody merely because he did not stay within its work area is so conclusory and deficient that it warrants exclusion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (stating a district court may exclude an expert's opinion when it "is connected to existing data only by the *ipse dixit* of the expert").

His other challenged opinions present tougher questions for the Court. The line between admissible expert testimony and impermissible legal opinions is often hazy and has shifted somewhat over time. Generally, "expert testimony on legal matters is not admissible" as such matters are within the province of the trial judge and their instructions to the jury. *S. Pine Helicopters, Inc.*, 320 F.3d at 841. As Western Sugar points out though, expert testimony as to "industry practice or standards may often be relevant" in cases like this one. *Id.* Such testimony may be admissible so long as an expert does not essentially instruct a jury as to what verdict it should reach. *See id.* (concluding testimony about industry standards was inadmissible in a case "about whether federal law was contravened"); *Lee v. Andersen*, 616 F.3d 803, 808 (8th Cir. 2010) (explaining opinions that embrace an "ultimate issue to be decided by the jury" may be admissible but an expert may not "merely tell the jury what result to reach" (internal quotation omitted)); Fed. R. Evid. 704(a) (providing "[a]n opinion is not objectionable just because it embraces an ultimate issue").

Some of Bennett's OSHA-related opinions regarding DSI's work at the Western Sugar facility skirt this line. The Court believes these difficult determinations are best left to be made in the fuller context of trial. Those challenges to Bennett's testimony as being "purely legal" are therefore denied without prejudice to their reassertion at that time.

9

The Court is also not yet persuaded that Bennett's circumscribed review requires wholesale exclusion. Expert testimony that fails to consider relevant facts of the case may sometimes be ripe for exclusion. *See McMahon v. Robert Bosch Tool Corp.*, 5 F.4th 900, 903 (8th Cir. 2021). But in most cases, challenges to "the factual underpinnings of the expert's opinion affect the weight and credibility of [an expert's] testimony, not its admissibility." *Structural Polymer Grp., Ltd. v. Zoltek Corp.*, 543 F.3d 987, 997 (8th Cir. 2008). Here, Bennett's limited scope of retention and failure to consider Suhr's records appear to fall under that broader rule. Beyond pointing out that Bennett did not review them, Zurich does not demonstrate how the content of Suhr's records renders his opinions about DSI fatally unreliable.

### 2.    DiTommaso's Testimony

Zurich argues DiTommaso's testimony should also be excluded for proffering "purely legal" opinions. Before founding DT Consulting, LLC, a safety-consulting company, DiTommaso had a lengthy career at OSHA and the National Parks Service in safety compliance, training, and investigation. Western Sugar offers DiTommaso to opine whether Western Sugar complied with the industry standards of care in relation to Cody's claims. Relying on his knowledge of industry regulations, contractual provisions, and extensive deposition testimony, DiTommaso concludes Western Sugar complied with OSHA and industry standards of care and exercised reasonable care to prevent unsafe conditions at the facility. He also plans to testify that Western Sugar could not reasonably have known about the fall hazard, foreseen the accident, or prevented it. Finally, he points the blame at Cody, opining that the fall hazard would not have happened if he had exercised reasonable care and followed instructions.

According to Zurich, such testimony regarding "what the relevant OSHA standards are in this case and whether a party's conduct violated those rules is a question of law for the Court." *See S. Pine Helicopters*, 320 F.3d at 841; *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, (D. Minn. 2018) (concluding expert testimony about the requirements of Title IX and whether the defendant complied with "the statute and its

associated regulations" was inadmissible).  It further asserts his opinions are not reliable, claiming he is not qualified to "speculate[] about human behavior," did not explain the methods used to reach his conclusions, and offers opinions base on insufficient facts. Zurich particularly accuses DiTommaso of "selective factfinding," worsened by the credibility assessments he allegedly made in weighing witness testimony.

Like other experts in this case, DiTommaso's testimony tests the boundary between admissible expert opinions and inadmissible legal conclusions.  For the same reasons stated above, the Court will defer making such difficult, context-specific determinations on a fuller record at trial.  As with Bennett, though, he will not be permitted to opine about the provisions of any contract between the parties.  That includes his attempt to link the provisions of the contract between Western Sugar and DSI to his conclusion that Western Sugar "did not have constructive knowledge that [] [Cody] would try to remove the hole cover."

The Court will also not presently exclude his testimony on the other grounds asserted by Zurich.  DiTommaso's experience sufficiently qualifies him to render opinions regarding the industry standards of care and how the actions of the parties at the jobsite measured up.  Unless he veers starkly outside of that specialized background, gaps in his skills and knowledge go to the weight of his testimony.  *See United States v. Perry*, 61 F.4th 603, 607 (8th Cir. 2023).

### 3.    Opinion that "We Don't Know" Cody's History

Goldtooth asks the Court to exclude "any opinions or statements from Dr. Davis that 'we don't know' about Cody['s] history."  Though parts of her request are a bit fuzzy on the details, it appears Goldtooth's concern about such statements is derived from Dr. Davis's deposition testimony regarding the lack of records indicating pre-existing psychiatric issues.  When asked by counsel whether the absence of records led him to "to believe that [Cody] didn't have any psychiatric issues," Dr. Davis responded, "That's one

11

possibility. The other possibility is we just don't have those records. They were not available or—could be a couple of possibilities."

Goldtooth worries that Dr. Davis might imply that this absence of information means "information is missing" from the record or was not properly disclosed. That testimony, she asserts, would be irrelevant and based on insufficient facts. Western Sugar maintains Goldtooth "misconstrue[s]" Dr. Davis's testimony. In its view, Dr. Davis merely emphasized the need to consider alternative causes of Cody's ailments and acknowledged there is evidence he has, at times, "minimize[d] his history after the accident."

Based on Western Sugar's response, it sounds like Dr. Davis does not plan on testifying that there may be additional information that was not disclosed. Given that, Goldtooth's motion to exclude on this ground is denied. Should Dr. Davis start to paint a different picture at trial, Goldtooth remains free to object.

### 4.    Opinions Regarding Prior Alcohol Use

The parties further disagree over the admissibility of certain opinions about Cody's pre-accident alcohol use. In his report, Dr. Davis diagnoses Cody with alcohol use disorder and opines that condition preceded his fall. Goldtooth states Dr. Merkler makes the same "causal link" in diagnosing Cody with a pre-existing alcohol use disorder.

As Goldtooth points out, the only record of Cody's pre-accident alcohol use pertains to a July 28, 2016 incident in which Cody was hospitalized after an assault. The medical records from that night show that Cody had a BAC of 0.16. When deposed, both Dr. Davis and Dr. Merkler admitted this is the only record of Cody's alcohol use before the fall. Goldtooth argues Dr. Davis's and Dr. Merkler's opinions lack sufficient factual bases and result from inadequate methods. Zurich also takes issue with Dr. Davis's alcohol-related opinions, asking the Court to exclude his testimony opining about Cody's

"BAC and alleged tolerance" on July 28, 2016, and any pre-existing alcohol use disorder as unreliable and prejudicial.

The Court agrees these opinions are unsubstantiated by the record and risk unfairly portraying Cody in a bad light. Though Rule 702 is generally one of admissibility, exclusion is warranted where an opinion "is fundamentally unsupported." *McMahon*, 5 F.4th at 903 (quoting *Neb. Plastics, Inc. v. Holland Colors Ams., Inc.*, 408 F.3d 410, 416 (8th Cir. 2005)). Western Sugar's experts practically concede that is the case here. The weakness of this testimony, on balance, also renders it inadmissible under Rule 403. *See United States v. Redd*, 81 F.4th 822, 830 (8th Cir. 2023) (stating expert evidence may be excluded "under Rule 403 even when Rule 702 is met"); *see also Two Rivers Bank & Trust v. Atanasova*, 686 F.3d 554, 563 (8th Cir. 2012) (upholding the exclusion of evidence of a motorist's pre-accident marijuana use where there was no evidence they were impaired at the time of the accident and such evidence could suggest a decision on an improper basis); *Erickson v. Baxter Healthcare, Inc.*, 131 F. Supp. 2d 995, 1003 (N.D. Ill. 2001) (excluding an expert's opinion regarding the plaintiff's "history of alcohol abuse" based on "[o]ne incident of intoxication and three admissions of an occasional drink" as "not very probative" and presenting an "extremely high" risk of prejudice).

**5.    Opinions Regarding Pre-Existing Conditions**

Goldtooth also asks the Court to preclude Dr. Davis and Dr. Hoffnung from testifying about any pre-existing conditions Cody may have and the potential effect of those conditions on his current injuries. Dr. Davis's report describes his opinion that Cody's neurocognitive disorder has multiple likely causes including his "other concussions and head injuries . . . , his heavy alcohol use, and possibly his seizure disorder." He also believes Cody may have "some preexisting learning disability and/or intellectual impairment." For her part, Dr. Hoffnung believes Cody's condition is impacted by "[p]re-existing issues including incomplete schooling and probably weakness/limitation in language development and/or language functions."

13

Goldtooth largely relies on the substantive principle under Nebraska law that an individual "injured by reason of the negligence of another" may "recover for all damages" including the "aggravation of [a] preexisting disease." *David v. DeLeon*, 547 N.W.2d 726, 729-30 (Neb. 1996) (discussing *McCall v. Weeks*, 164 N.W.2d 206, 210 (Neb. 1969)). Once the plaintiff demonstrates their condition was proximately caused by the defendant's negligence, the defendant bears the burden of proving the proper apportionment of damages. *See id.* at 730; *see also Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1294 (8th Cir. 1997) ("To limit its liability through apportionment, a defendant must prove that a plaintiff's damages are divisible, and other outside factors contributed to the plaintiff's harm"). A defendant may fail to establish apportionment if their experts are "unable to state with reasonable medical certainty what portion" of the plaintiff's injuries was caused or not caused by their negligence. *DeLeon*, 547 N.W.2d at 730; *see also Kirchner v. Wilson*, 554 N.W.2d 782, 785 (Neb. 1996) (concluding a jury instruction on apportionment was warranted where the degree to which the plaintiff's "preexisting condition was aggravated could not be determined"). Where a jury cannot separate the damages caused by a pre-existing condition from those caused by the subject accident, the defendant is liable for all of the plaintiff's damages. *See DeLeon*, 547 N.W.2d at 730*; Snyder v. Contemporary Obstetrics & Gynecology, P.C.*, 605 N.W.2d 782, 794 (Neb. 2000).

Those principles, however, do not entitle Goldtooth to the requested limitations on Western Sugar's experts at this time. Whether Dr. Davis's and Dr. Hoffnung's opinions are sufficient to warrant apportionment is a matter to be determined by the jury at trial. *See DeLeon*, 547 N.W.2d at 729-30; *Tadros v. City of Omaha*, 694 N.W.2d 180, 187 (Neb. 2005) ("Determining apportionment of negligence is solely a matter for the fact finder."). The mere possibility that a jury may conclude that evidence is too weak to establish apportionment of damages in this case does not automatically render it inadmissible.

14

### C.    Goldtooth's Experts

#### 1.    Stentz's Testimony

First, Western Sugar seeks to exclude all of Stentz's expert testimony at trial. It asserts his methodology is not reliable and that his conclusions are one-sided, unhelpful, and contain inadmissible propensity evidence. Upon review, the Court concludes any weaknesses of Stentz's testimony go to weight rather than admissibility.

Stentz is an experienced professional ergonomist, industrial engineer, and occupational-health scientist. He is currently engaged in "fall risk analysis modeling" and other industry safety research funded by a number of private and public stakeholders. He teaches at the University of Nebraska-Lincoln, University of Nebraska Medical Center, and Ohio State University, and is an OSHA Authorized Outreach Trainer in general industry and construction safety.

In his report, Stentz describes the methods of "[a]ccident and incident Root Cause Analysis" he employed to assess Cody's accident, including an "Accident Timeline Diagram," "Five Whys Diagram," and "Fish Bone Diagram." According to Stentz, such root cause analysis is a well-accepted method to "retrospectively analyze and identify root causes so that an employer can reduce or completely eliminate the same accident or incident in the future."

Through his analysis, Stentz proffers various causes of Cody's accident, including Western Sugar's history of fall accidents and the contemporaneous conditions and events at the jobsite. Stentz generally places the blame for safety failures on Western Sugar, concluding Cody "had no reason to suspect or know" of the fall hazard. Stentz also plans to testify that Western Sugar was the General Contractor of the project based on the record and his industry knowledge, Western Sugar was required by certain OSHA regulations to provide a safe workplace, and Western Sugar's history of fall accidents demonstrates it failed to take proper corrective measures.

15

Western Sugar objects to the entirety of Stentz's opinions. It attempts to delegitimize Stentz's root cause analysis methodology, framing it as a subjective and uncertain "brainstorming session" that any lay person could utilize. It also faults his methods for failing to identify "a single causal element" or a "proximate cause of an accident." Overall, Western Sugar asserts such testimony does not utilize reliable "scientific or technical analyses" or assist the jury in understanding the case. It also argues Stentz's opinions based on earlier fall accidents at Western Sugar's facilities "constitute pure 'prior bad acts' evidence that should be inadmissible at trial." *See* Fed. R. Evid. 404(b)(1) (providing that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character").

The Court agrees with Goldtooth and Zurich that Western Sugar's complaints are, for the most part, wrongly placed. *Daubert* and its progeny inform the Court's "preliminary assessment of whether the reasoning or methodology underlying [an expert's] testimony is scientifically valid" and whether those methods "can be applied to the facts in issue." *Lancaster v. BNSF Ry. Co.*, 75 F.4th 967, 969 (8th Cir. 2023). In general, the Court's case-specific inquiry focuses on whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Am. Auto. Ins. Co.*, 783 F.3d at 721 (quoting *Kumho Tire*, 526 U.S. at 152).

As Western Sugar's own experts testified, root cause analysis is an industry-accepted method applied in circumstances like the subject incident. Various agencies, including OSHA, utilize root cause analysis methods as part of their incident-response protocols. Western Sugar's assertions that Stentz's methods are neither overly complex nor utilized to identify a singular, proximate cause of an accident do not gainsay the fact that his testimony is based on specialized knowledge, helpful to the trier of fact, and generally reliable.

Like the opinions of Bennett and DiTommaso, some of Stentz's conclusions present closer calls. "Pursuant to Rule 703, an expert may rely on otherwise inadmissible [] evidence in forming his opinion if the facts and data upon which he relies are of a type reasonably relied upon by experts in his field." *Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir. 1997). But the admissibility of evidence of prior accidents in negligence cases is usually limited. When introduced as proof of a defect or notice of a dangerous condition, for example, courts frequently require the proponent to show "that the prior incidents 'occurred under circumstances substantially similar to those' at issue in the case." *Adams v. Toyota Motor Corp.*, 867 F.3d 903, 913 (8th Cir. 2017) (quoting *Arabian Agric. Servs. Co. v. Chief Indus., Inc.*, 309 F.3d 479, 485 (8th Cir. 2002)).

It is not completely clear that Stentz's proposed use of the past-incident evidence fits within this line of cases. And while he admits to not knowing all of the specifics about those events, Stentz's report reveals some meaningful similarities between those fall-related incidents and Cody's accident that might reliably inform his opinion. The Court is not convinced at this time that testimony arising from those incidents should be entirely excluded based on the parties' arguments. Those decisions will, therefore, be made upon proper objections at trial. For the reasons explained above, any determination on his conclusions that border on inadmissible legal opinions will also be deferred.

## 2.    Opinions Regarding the Progression of Cody's Injury

Dr. Prusmack is the Chief of Neurosurgery at the Rocky Mountain Spine Clinic in Denver, Colorado. He has performed thousands of craniotomies like the one performed on Cody and regularly consults "on traumatic brain injuries and head injuries" as a neurological consultant to athletes. Dr. Prusmack personally examined Cody in December 2022 and performed "qEEG [brain mapping], Extensive Neurological Balance testing, and Advanced MRI imaging." Based on this examination and his review of Cody's records, Dr. Prusmack diagnosed Cody with a number of injuries, including a severe traumatic brain injury that has developed into "encephalomalacia and diffuse

axonal injury." Dr. Prusmack opines these conditions are severe and permanent and will cause "progressive, degenerative conditions that will eventually cause his death."

Dr. Wicklund largely agrees with Dr. Prusmack's assessment. Dr. Wicklund has worked in clinical psychology and neuropsychology for nineteen years, treating patients with brain injuries "ranging from concussion to severe traumatic brain injury." After reviewing Cody's records and the evaluations of other medical professionals, she opines that Cody is suffering from a severe traumatic brain injury, damage to frontal brain regions, and diffuse axonal injury. Though she states only 30% or so of patients with moderate to severe traumatic brain injuries "experience further decline over time," Dr. Wicklund believes that Cody's injuries are causing a "pattern of cognitive, behavioral, and emotional dysfunction [that] may last for decades or his lifetime, [] without significant improvement."

Western Sugar objects to Dr. Prusmack's and Dr. Wicklund's conclusions that Cody's condition will worsen over time and develop into other neurological disorders. It asserts those opinions are speculative, not based "on any discernible scientific principle or methodology," contradict other peer-reviewed research about traumatic brain injuries, and arise from anecdotal, subjective knowledge.[4] In support, Western Sugar points to the opinions of Dr. Merkler—a physician specializing in neurology—that the medical community generally believes patients with even severe traumatic brain injuries "are

---

[4]Contrary to Western Sugar's belief, medical experts can testify based on their own "specialized knowledge." Fed. R. Evid. 702(a); *Maiz v. Virani*, 253 F.3d 641, 669 (11th Cir. 2001) (explaining "there is no question that an expert may [] properly base his testimony on 'professional study or personal experience'" instead of "verifiable testing or studies." (quoting *Kumho Tire*, 526 U.S. at 151)). The rules of evidence do not require a medical expert to support each of their conclusions with citations to formal research. *See Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1208-09 (8th Cir. 2000) (stating a medical causation expert can render a reliable opinion based on differential diagnosis and need not always cite published studies); *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 124 (2d Cir. 2020) (per curiam) (stating "an expert need not back his or her opinion with published studies that support his or her conclusion if he or she has utilized reliable scientific methods to reach that conclusion").

likely to demonstrate ongoing neurologic recovery" over months or years. He also asserts the risk of developing dementia "remains very low" in patients with such injuries, but admits that studies show such patients face a higher risk of dementia because of their injuries.

The Court appreciates the vigorous debate between these medical professionals, but that is all it is. *See Kumho Tire*, 526 U.S. at 153 (stating it is generally the jury's role, not the Court's, to "decide among the conflicting views of different experts"). Despite Western Sugar's assertions, the Court is satisfied Dr. Prusmack's and Dr. Wicklund's opinions are reliable in an evidentiary sense. The doctors considered a plethora of information in assessing Cody's injuries, including the results of accepted forms of medical evaluation, extensive medical records, and a variety of social and biological factors. *See, e.g.*, *Tedder v. Am. Railcar Indus., Inc.*, 739 F.3d 1104, 1109 (8th Cir. 2014) (concluding a medical expert's diagnosis was admissible where it relied on patient-reported symptoms, tests, a CT scan, and other physicians' reports). Overall, Dr. Prusmack and Dr. Wicklund seem to have reached their opinions in a reliable manner that accords with practitioners in their specialized fields.

Further, Dr. Merkler admits that some research supports the concept that patients with Cody's injury might experience the worsening conditions predicted by Dr. Prusmack and Dr. Wicklund, even though he doesn't believe that outcome is likely here. *See In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 614 (8th Cir. 2011) ("Objections to generally reliable scientific evidence go to its weight, not its admissibility."); *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th 768, 789 (8th Cir. 2021) (explaining the Court should not exclude expert testimony by "tak[ing] a side on an issue that is 'currently the focus of extensive scientific research and debate'" (quoting *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 22 (1st Cir. 2011))). It would be inappropriate for the Court to "weigh or assess the correctness of [these] competing

19

expert opinions." *Johnson*, 754 F.3d at 562. Any asserted weaknesses in their opinions may be examined by Western Sugar and its experts at trial. *See Lauzon*, 270 F.3d at 694.

### 3.    Opinions Regarding Cody's Personality Changes

The Court reaches the same conclusion with regard to Western Sugar's opposition to testimony about Cody's purported personality changes. As Dr. Prusmack describes, a "review of [Cody]'s records and interviews with his family members" indicates he has undergone "significant changes to his personality." Unlike before the accident, Cody reportedly struggles with impulsivity, depression, anxiety, anger, and executive reasoning.

Dr. Prusmack highlights a number of neurological conditions that could be contributing to what he calls "Phineas Gage" syndrome, or a change in personality from a permanent injury to the frontal lobe. According to Dr. Prusmack, Cody's frontal lobe was partially "obliterated and suctioned out" during the post-fall craniotomy. In all, his initial injury and surgery have resulted in Cody's "left frontal lobe [being] smaller than 99% of similarly situated, non-brain injured patients." That region of Cody's brain, which is vital for "motor, speech, and executive function[ing]" skills, is also suffering from lesions caused by diffuse axonal injury, according to Dr. Prusmack.

Western Sugar asserts these "opinions lack a valid scientific basis and are nothing more than invalid *post hoc ergo prompter hoc* reasoning." It states that any such dysexecutive-syndrome diagnosis should be "made through neuropsychological testing," which those experts did not conduct. Western Sugar highlights the testing completed by Dr. Craig Nupp, Dr. Frances Robbins, and Dr. Hoffnung, which it purports did not reveal such executive-functioning difficulties. Finally, it attacks any use of differential diagnosis methods as unreliably applied to the facts of the case. Of course, Goldtooth disagrees.

So does the Court. Dr. Wicklund's and Dr. Prusmack's opinions to this end meet the requirements for admissibility under the applicable, liberal standards. Both are highly

qualified in the relevant subject area and offer testimony about Cody's condition in a manner that would be useful to a factfinder. *See Academy Bank, N.A.*, 116 F.4th at 790. Their conclusions regarding Cody's frontal-lobe injury and personality changes are, like their other opinions, based on extensive evaluations and records. Regardless of Western Sugar's nit-picking, the manner in which Dr. Wicklund and Dr. Prusmack reached their respective conclusions seems sufficiently reliable to render them admissible. *See id.* at 791 (explaining even a "differential expert opinion" made "with less than full information" may be admissible and subject to cross-examination). Any criticism or opposition to their opinions is for a jury to weigh at trial.

### 4.    Rebuttal Expert Reports

Finally, Western Sugar asks the Court to exclude the entirety of Goldtooth's rebuttal expert reports on the ground that their content "belong[s] squarely in [her] case-in-chief." Goldtooth submitted rebuttal reports from previously disclosed experts Dr. Wicklund, Dr. Prusmack, Roughan, Fischer, Stentz, and Stricklett. She also offers the opinions of Fletcher—a safety consultant with seventeen years of experience as an OSHA official—who she retained solely as a rebuttal expert.

Western Sugar makes a number of largely unfounded attacks on these rebuttal opinions. It asserts the expert's rebuttal opinions "simply reiterate the opinions previously disclosed in [their] initial expert" reports and are therefore cumulative and improper on rebuttal. It further accuses Goldtooth of merely attempting to "bolster and 'clean up'" the testimony of her other safety experts by introducing Fletcher's opinions.

The general "function of rebuttal testimony is to explain, repel, counteract or disprove evidence of the adverse party." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006) (quoting *United States v. Lamoreaux*, 422 F.3d 750, 755 (8th Cir. 2005)). It is widely acknowledged, though, that proper rebuttal testimony is not inadmissible merely because it "may have been offered in the plaintiff's case-in-chief." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1224 (10th Cir. 2010); *see also United States v.*

*Luschen*, 614 F.2d 1164, 1170 (8th Cir. 1980) ("The fact that testimony would have been more proper for the case-in-chief does not preclude the testimony if it is proper both in the case-in-chief and in the rebuttal."). "Allowance of a party to present additional evidence on rebuttal depends upon the circumstances of the case and rests within the discretion of the individual most able to weigh the competing circumstances, the trial judge." *Marmo*, 457 F.3d at 760 (quoting *Gossett v. Weyerhaeuser Co.*, 856 F.2d 1154, 1156 (8th Cir. 1988)).

To start, Goldtooth is at least partially correct that Western Sugar's reliance on the general rules governing the introduction of rebuttal evidence are not a perfect fit for this context, though they are sometimes applied in similar circumstances. Certainly, noncompliance with the rules for introducing rebuttal evidence may warrant objections and exclusions at trial. But Western Sugar's desire for the Court to strictly apply them here and exclude whole rebuttal reports is a stretch.

Its assertions regarding the "cumulative" nature of the rebuttal reports are also convoluted. It comes as no surprise that experts frequently proffer rebuttal testimony consistent with their earlier conclusions. And for good reason: if their opinions were truly reliable and thorough in the first place, they should not be expected to falter just because an opposing party's expert has a different opinion. Simply put, otherwise proper rebuttal testimony that challenges an opposing party's evidence is not overly cumulative merely because it is consistent with an earlier opinion.

Dr. Wicklund, Dr. Prusmack, Roughan, Fischer, Stentz, and Stricklett all utilize their reports to challenge the bases, methods, and conclusions of Western Sugar's experts. *Marmo*, 457 F.3d at 759 (explaining "rebuttal evidence may be used to challenge the evidence or theory of an opponent"). Even if those experts knew the general conclusions Western Sugar's experts would make before forming their initial opinions, they cannot be expected to foresee particular authorities and methods that may be objectionable. The Court sees no persuasive reason to strike those reports entirely based on Western Sugar's

22

arguments, but the introduction of testimony based on those reports remains subject to relevant objections at trial.

Western Sugar also does not persuade the Court to exclude the entirety of Fletcher's rebuttal testimony. Properly disclosed expert rebuttal opinions need not come from an expert who was disclosed as part of the plaintiff's case-in-chief. *See* Fed. R. Civ. P. 26(D)(ii). Even after trial is underway, "a party may call a previously undisclosed rebuttal expert after the opposing party's expert has testified . . . under limited circumstances." *Mathis v. Roa*, 793 F. App'x 367, 370 (6th Cir. 2019) (unpublished). Fletcher's report is responsive to the opinions of Western Sugar's experts even if, as stated earlier, some of his conclusions could also fall within Goldtooth's case-in-chief. Under the particular circumstances of this case, the wholesale exclusion of his testimony is unwarranted.

For the reasons above and subject to the development of testimony at trial,

IT IS ORDERED:

1. Plaintiff Jaime Goldtooth's "*Daubert* Motion to Exclude Expert Testimony" (Filing No. 196) is granted in part and denied in part.

2. Plaintiff Zurich American Insurance Company's "*Daubert* Motion to Exclude Testimony from Defendant's Expert Witnesses" (Filing No. 192) is granted in part and denied in part.

3. Third-party defendant DSI Mechanical, LLC's "Motion to Exclude the Testimony of Defendant/Third-Party Plaintiff Western Sugar's Retained Expert Paul Bennett" (Filing No. 175) is granted in part and denied in part.

4. Any testimony by Western Sugar's experts regarding the terms of contracts between the parties or Cody's pre-accident alcohol use are excluded. Paul Bennett's conclusory opinion that DSI failed to train Cody is also excluded.

5. Defendant and third-party plaintiff The Western Sugar Cooperative's "Rule 702/*Daubert* Motion to Exclude Terry L. Stentz" (Filing No. 183), "Motion to Strike Plaintiff's Rebuttal Expert Opinions" (Filing No. 186), and "Motion to Exclude Expert Testimony" (Filing No. 189) are denied.

Dated this 18th day of November 2024.

BY THE COURT:

Robert F. Rossiter, Jr.
Chief United States District Judge